## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>Kristie Larrea,<br><br>        Debtor. | Chapter 7<br><br>Case No. 25-73260-las<br><br>Honorable Louis A. Scarcella, U.S.B.J. |
| 2 Girls ACCYS LLC,<br><br>        Plaintiff,<br><br>v.<br><br>Kristie Larrea,<br><br>        Defendant. | Adv. Pro. No. 25- ___ |

## COMPLAINT

2 Girls ACCYS LLC ("Plaintiff" or "Company"), by and through its undersigned counsel, by way of Complaint against Kristie Larrea ("Debtor" or "Kristie")), alleges as follows:

## NATURE OF THE ACTION

1.      This adversary proceeding seeks entry of a judgment that certain debts owed by the Debtor to the Plaintiff are excepted from discharge pursuant to 11 U.S.C. § 523(a)(4) and (a)(6).

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over the claims asserted in this Complaint pursuant to 28 U.S.C. § § 157(b)(2)(B), (I) and (J) and 1334(b).

3.      Venue of this proceeding properly lies in this Court pursuant to 28 U.S.C. §§ 1408 and 1409(a).

4.      This matter constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B), (I) and (J).

## THE PARTIES

5.      Plaintiff is a New York limited liability company.

6.      Kristie is an individual residing in New York and is the Debtor in the above-referenced bankruptcy case.

## THE FACTS

**A.  The Larreas Approach The Bochis About Investing in a New Company called "2 Girls"**

7.      In or about October 2015, Kristie and her sister Kathie Larrea ("Kathie" and, together Kristie, "Larreas") approached Abe ("Abe") Bochi and Peter ("Peter") Bochi (collectively, "Bochis") about an investment in a new company that they called "2 Girls", which would be based in New York City.

8.      The Bochis own and operate several companies in Canada in the accessories, apparel and related businesses. They were considering expanding their business into the United States at the time that the Larreas approached them.

9.      The Larreas offered to be the Bochis' "eyes and ears" in the U.S.

10.     The Bochi entities' offices, employees, etc. are located in Canada, and as such it was made clear by the Bochis and well understood by the Larreas that the Bochis would remain in Montreal, and would rely on the Larreas to manage the new U.S. operations.

11.     In or about late 2015, before the first meeting between the Larreas and the Bochis, the Larreas provided the Bochis with a 28 page business plan, entitled "two girls accessories" and "we know girls..." ("Business Plan").

12.     In the Business Plan, the Larreas made numerous representations about their own extensive backgrounds in apparel, accessories and fashion (at 3-4), and stated that "2 Girls Accessories ('2 Girls') is a new brand that is being created to directly target the lucrative tween

girl market (ages 8-12)" and "2 Girls is a startup accessory wholesale/distributor company geared to bringing on trend fashion accessories to the junior and tween apparel & accessory retailers" (at 1, 3). The Larreas also stated that "[t]o initially become established in the market, the Company is seeking the availability of $1.5 million to launch and develop 2 Girls as a tween brand" and "2 Girls is seeking investors to share ownership 60/40" (at 1, 5), meaning that the Larreas were seeking a majority investor to provide funding for a 60% ownership position in "2 Girls Accessories".

13.     On the basis of the Larreas' written and verbal representations, the Bochis began to fund the payment of salaries to the Larreas early on (in or about early 2016), well before the first written agreement was executed over a year later.

14.     The Bochis paid the Larreas to prepare a business plan and financial projections for "2 Girls Accessories" and to generate sales orders for "2 Girls Accessories". The Bochis also funded all of the "2 Girls Accessories" overhead, such as the Larreas' salaries and the lease of office space in New York City.

15.     The Bochis reasonably relied on the Larreas' representations to them, including but not limited to those in the Business Plan, in deciding to fund and invest in the Larreas' enterprise, pay the Larreas' salaries and enter into a business relationship with the Larreas.

16.     Through their various entities, the Bochis paid more than $2,000,000 in overhead, salaries, lease expenses and other costs. The parties agreed that the new business was required to repay these funds to the Bochis, and this agreement was ultimately memorialized in the Term Sheet Operating Agreement ("TSOA", as further defined below) when the parties' agreement was placed in writing.

3

17.     Before the parties entered into the TSOA, the Larreas did not input into the computer system established with the accounting firm G&A Services ("G&A") all of the business information for the orders that they produced.

18.     The Larreas' entry of business information was essential for the Bochis, so that they could access such computer system and thus keep apprised of the Larreas' operations, as the Larreas had agreed with and represented to the Bochis that they would do. The Bochis requested that the Larreas do so, to no avail.

**B.  The Company's Term Sheet Operating Agreement**

**1.  The Company's ownership structure and the Larreas' Manager and Director positions**

19.     On or about July 3, 2017, the Company was organized as a limited liability company pursuant to Section 203 of the New York Limited Liability Company Law.

20.     In or about September 2017, the Bochis' entities 9281-5109 Quebec Inc. ("Quebec Inc.") and 2 Girls Holding Corp. ("Holding Corp."), the Larreas' entity Mehjeez Designs, LLC ("Mehjeez") and the independently owned Natanel Trust, executed the Term Sheet of Operating Agreement of 2 Girls Accys LLC, A New York Limited Liability Company, or TSOA. A true and correct copy of the TSOA is attached hereto as **Exhibit A**.

21.     Kathie Larrea executed the TSOA on behalf of Mehjeez, as its Member and President.

22.     The TSOA provided that ownership of the Company was apportioned as follows: (a) 64.5% to Holding Corp.; (b) 25.5% to Mehjeez; and (c) 10% to the Natanel Trust. (¶2) (The Company, Mehjeez and the Natanel Trust are collectively referred to herein as "Members").

23.     Abe and Peter Bochi own 100% of Quebec Inc. In turn, Quebec Inc. owns 100% of Holding Corp., and Holding Corp. owns 64.5% of the Company. Accordingly, these relationships involving the Bochis may be depicted as follows:

The Company ← (64.5%) Holding Corp. ← (100%) Quebec Inc. ← (100%) Abe

Bochi and Peter Bochi

24.     The TSOA provided that "[t]he Company will have two managers, one designated by 2 Girls Corp. [Holding Corp.] and one designated by Mehjeez." (¶ 9)

25.     Holding Corp. designated Abe Bochi as a Company manager, and Mehjeez designated the Debtor as a Company manager.

26.     The TSOA provided that Kathie Larrea and Kristie Larrea would be hired by the Company as its Director of Operations and Director of Sales and Design, respectively, pursuant to written employment agreements. (¶1) The TSOA further provided that, in performing their respective jobs for the Company, the Larreas "will work exclusively for the Company and not for their own account or any other party nor will they accept compensation of any sort from suppliers, vendors or customers." (¶1)

27.     By virtue of her role as Company manager and Director of Operations for the Company, Kathie Larrea acted in a fiduciary capacity with respect to the Company.

**2.      Additional clauses of the TSOA**

28.     The TSOA provided that, "[u]pon the full execution of the Company's operating agreement, Kathie will immediately assign to the Company all her right, title and interest in the domain name '2girlsaccessories.com' and website, any associated email accounts and all other intellectual property associated with the Two Girls brand, including but not limited to trade names, trade-marks, etc." (¶3)

29.     As described above, Quebec Inc. and its affiliates advanced loans to 2 Girls Accessories (collectively, "Loans") to fund its operations prior to the execution of the TSOA. The TSOA obligated the Company to repay the Loans and provided that the Larreas would not receive any bonuses, profits or dividends until the Company repaid the Loans in full, plus interest at the rate of 4% per annum. (¶7) As of the date of the TSOA, the principal amount of the Loans was $1,621,750.09, (¶7), though it ultimately reached more than $2,000,000 over time.

30.     In order to attempt to remedy the Larreas' prior failures to input all of the business information into the G&A computer system so that the Bochis could access such computer system and thus keep apprised of the Larreas' day-to-day operations, the TSOA set forth in paragraphs 10 and 11 the rights of (a) Holding Corp. as a Member to all Company books and records, etc., (b) Abe as a manager to periodic reports from the Larreas and (c) the Bochis to approve purchase orders for merchandise. The TSOA also required the Larreas to "continue to observe all other procedures currently in place", which included inputting all necessary business information into the G&A computer system.

31.     Specifically, the TSOA provided that the Larreas were to "superintend the day-to-day operations of the company", except for issuing purchase orders for merchandise. (¶10) The TSOA provided that the Larreas shall not issue purchase orders for merchandise without the prior written approval of Abe Bochi, Peter Bochi or Earl Levett (who was Quebec Inc.'s CFO) "after presentation of a copy of the proposed purchase order with explanation of landed cost, sales price per unit, number of committed units sold and gross profit percentage (the 'Order Information')". (¶10) The TSOA further provided that "Kathie and Kristie shall also furnish the manager(s) and the Trust and Nir with periodic reports on the Company's general business activities and continue to observe all other procedures currently in place." (¶10)

32.     The TSOA provided that "all members shall have access to and copies of the Company's books and records (whether in hard copy or electronic format), including but not limited to sales reports, costs or good sold, margins." (¶11)

33.     The TSOA also prohibited the Larreas, as well as others, from disclosing or otherwise providing to third parties, including without limitation the Company's competitors, the Company's confidential or proprietary information:

> Without limiting the foregoing, neither Nir nor anyone acting on behalf of the Trust, nor Kathie, Kristie, Abe Bochi or Peter Bochi, or the entity with which such person is affiliated shall not, except in connection with a good faith exercising of the Trust's rights in connection with paragraphs 13(a) or 15 below, disclose or otherwise provide to third parties, including without limitation competitors of the Company, confidential or proprietary information of the Company, including financial information, pricing and sourcing details, artwork and designs. Notwithstanding the foregoing, the disclosure of information, artwork and/or designs reasonably required to manufacture or to purchase from any manufacturer or supplier, any product for the Company, shall not constitute a breach of fiduciary duty to the Company, regardless of whether or not any competitors of the Company who may visit any factory or facility manufacturing or assembling products for the Company ever see or learn of any of the Company's information, artwork and/or designs or products being manufactured or assembled at any such factory or facility. (¶12)

34.     The TSOA's parties considered such information to be so important to the Company that they provided in the TSOA that an uncured breach of fiduciary duty to the Company would result in the breaching party forfeiting its rights to receive such information. (¶12.ii.c)

35.     Under the TSOA, the Members "shall at all times act in good faith in exercising their rights set forth in this Term Sheet, and no member shall unreasonably withhold, condition or delay any consent which is needed from such member pursuant to the terms of this Term Sheet." (¶22)

36.     The TSOA further provided in ¶24:

This Term Sheet is intended to be an outline of terms and conditions for the transactions among the parties, forming the basis for definitive agreements with respect thereto. Until such time as the parties execute and deliver such definitive

agreements, they shall conduct the business of the Company and their mutual relationship in a manner consistent with the terms of this Term Sheet and shall otherwise be bound hereby.

(¶24)

37.    The Members did not execute or deliver any further agreements other than the TSOA. Accordingly, the TSOA bound the Members and set forth the obligations and responsibilities of the Members and the other parties thereto.

### C.  Debtor's wrongful acts, conduct and omissions

38.    Kathie Larrea and Kristie Larrea engaged in a series of wrongful acts, conduct and omissions that concealed their improper performance of the Company's day-to-day operations and that prevented Plaintiff from understanding their malfeasance and nonfeasance in "operating" the Company in which Abe Bochi was a manager and Holding Corp. was a Member and the majority owner.

39.    As a result, as addressed herein, it was only a few months after the TSOA was executed in September 2017 that Quebec Inc., Holding Corp. and the Company were obliged to send a December 21, 2017 letter to the Larreas, requesting that they comply with their duties and responsibilities in connection with the Company, including but not limited to input the necessary information to the G&A computer system. The response by the Larreas' counsel consisted of denials and baseless counteraccusations. Nevertheless, the Larreas did not input all of the necessary Company business information, and all such information remains unknown to Plaintiff. In addition, the Larreas failed and refused to provide the Bochis, Quebec Inc. and Holding Corp. with access to the Company's email domain, notwithstanding that the TSOA provides that "all members shall have access to and copies of the Company's books and records (whether in hard copy or electronic format), including but not limited to sales reports, costs or good sold, margins" (¶11) The Larreas' emails with Company customers, prospective customers, suppliers and

vendors, using the "2 Girls Accessories" email domain address, constitute the Company's property.

40.     The Larreas failed and refused to input all of the necessary information required for accounting purposes into the Company's password-protected computer system, and prevented Member Holding Corp. and manager Abe Bochi from access to the Company's Dropbox and Microsoft platforms. The Larreas continuously denied Member Holding Corp.'s and manager Abe Bochi's access to the Dropbox account, until access was finally given in early 2018, when the Bochis began voicing concerns about irregularities with how the Larreas were invoicing the Company's suppliers. Once Member Holding Corp. and the Bochis, acting on the Company's behalf, finally received access to the Dropbox, it became apparent that the Larreas had failed to transfer all of the Company's business documentation into the Dropbox.

41.     The Larreas continually prevented Holding Corp. and the Bochis on the Company's behalf from full access to (a) the Company's books and records in violation of the TSOA and (b) G&A.

42.     At all times, the Larreas remained selective about the information to which they provided access to Holding Corp. and the Bochis, particularly communications between the Larreas/Mehjeez and the Company's suppliers. They rarely, if ever, copied the Bochis on such correspondence.

43.     In addition, notwithstanding numerous requests from Holding Corp. and the Bochis, the Larreas and Mehjeez declined to provide them with the Company's sale projections, which prevented them from engaging in appropriate business planning for the Company's benefit.

44.     The Larreas and Mehjeez also failed to implement accounting and financial systems such that there was no coordination between the sales and purchases of products at the warehouse and the financial reporting necessary for the Company's finances and accounting.

45.     Kathie Larrea failed and refused to assign to the Company all of her right, title and interest in the domain "2girlsaccessories.com" and website, any associated email accounts and all other intellectual property associated with the "2 Girls Accessories" brand, including but not limited to trade names, trademarks, etc. as required by the TSOA's ¶3.

46.     The Larreas routinely failed to input the requisite business information into the Company's accounting system, which was administered by G&A. As a result, they concealed from Holding Corp. and the Bochis, who were acting on the Company's behalf, an accurate representation of the Company's financial status.

47.     Despite repeated requests from Holding Corp. and the Bochis that the Larreas and Mehjeez input the accounting information into the G&A system, they insisted that they directly perform the Company's purchasing.

48.     Consequently, the Bochis approached G&A representatives, asking if they could perform the purchasing for the Company, so that G&A could provide them with an accurate account for all of the Company's transactions and inventory. Each time that they did so, however, they were told that, given conflicting requests from the Larreas and the Bochis, G&A required authorization from both parties. The Larreas declined to provide such authorization.

49.     The Larreas controlled how much information went to G&A in the first place. They never provided complete data to G&A. By way of example, the very first time that the Bochis were able to obtain a sales order confirmation report from G&A was in July 2018, after the Larreas had resigned from the Company.

50.     The Larreas wrongfully withheld from Holding Corp. and the Bochis, who were acting on the Company's behalf, the passwords necessary for administrator (or administrative) access to the Company's computers and email accounts.

51.     Holding Corp. and the Bochis were entitled to such passwords pursuant to the TSOA's ¶3 and ¶11, given Abe's position as a Company manager and Holding Corp.'s (a Member of the Company) majority ownership interest in the Company, as well as given the Larreas' fiduciary responsibilities to the Company and Holding Corp. and that the Larreas resigned from and abandoned the Company.

52.     Without the computer and email passwords and other business information, the Company was forced to permanently terminate its business operations because it could not operate without this necessary information.

53.     The Larreas' and Mehjeez's misconduct caused the Company to suffer irreparable harm. Their refusal to provide the Company computer and email passwords and to return its confidential business information eroded the goodwill that the Company had generated with its clients, suppliers, vendors, etc., causing the Company to permanently lose customers and to suffer severe, irreparable harm to its business reputation.

54.     The Company's computer systems were password-protected. The Larreas' and Mehjeez's failure and refusal to provide such passwords to Holding Corp. and the Bochis, who were acting on the Company's behalf, notwithstanding that Abe was a manager of the Company and Member Holding Corp. owned a majority of the Company, so that they could attempt to save the Company, in large part caused the Company's failure and destruction.

55.     Thus, the Larreas and Mehjeez blocked access to the Company's information such that Holding Corp. and the Bochis, acting on the Company's behalf, did not have appropriate and complete access to Company records, including but not limited to emails, account information and other operational and managerial information, notwithstanding that the TSOA provided that "all members shall have access to and copies of the Company's books and records (whether in hard

copy or electronic format), including but not limited to sales reports, costs or good sold, margins." (¶11)

56.     On December 21, 2017, Quebec Inc., Holding Corp. and the Company provided the Larreas and Mehjeez with written notice of their breaches of their obligations under the TSOA and their failure to act in accordance with their other duties (which included their fiduciary duties to the Company and Holding Corp.).

57.     By way of January 23, 2018 letter, Quebec Inc., Holding Corp. and the Company gave notice to the Larreas and Mehjeez of their ongoing breaches of their obligations that included, but were not limited to, failure to (a) appropriately enter customer orders and changes to order into the Company's computer system on a timely basis, (b) appropriately enter suppliers' invoices into such computer system and process suppliers' invoices in a timely manner, (c) provide administrative rights to the Company's Dropbox and computer accounts and (d) transfer the trade names and trademarks to the Company as required by the TSOA's ¶3.

58.     On or about June 4, 2018, Kathie and Kristie submitted a letter stating that they were terminating their employment with the Company.

59.     By way of June 7, 2018 letter, the Bochis further placed the Larreas on notice that there were "serious issues with the manner in which you have discharged your responsibilities to the company and your fellow stakeholders". The June 7, 2018 notice stated that the Larreas persisted in failing to "properly update the company's records, failed to provide Dropbox and Microsoft access to Abe or Peter [Bochi] and failed to provide proper budgets and forecasts. Your actions and omissions have compromised the future of the company and have caused what now appears to be irreparable harm to the trust relationship among all the partners."

60.     By way of July 6, 2018 email, the Larreas were again put on notice that they continued to disregard their obligations to update Company records and provide the Bochis with

"full administrative access to all books and records" of the Company, including access to email accounts. The July 6, 2018 notice informed the Larreas that the email access was "needed urgently" and requested that they provide it by Monday, July 9, 2018. The July 6, 2018 notice also directed the Larreas to "preserve and protect all such records, as well as any other intellectual property and confidential information rights of the company", advising them that they will be held responsible for any failure to do so.

61.    The Larreas did not provide the requested administrative access to all books and records and email accounts, and computer and email passwords.

62.    After their resignations, the Larreas and Mehjeez continued to deny to Holding Corp. and the Bochis, acting on the Company's behalf, full access to all previous communications by blocking administrative access to the "2 Girls Accessories" email domain, which seriously interfered with their ability to attempt to manage the Company's business and save the Company from destruction.

63.    The Larreas and Mehjeez thereby prevented the Company from communicating with Company customers. As a result, the Company was prevented from taking actions to preserve what remained of the Company's business and customer relationships. By way of example, the Company was unable to access or respond to important communications with U.S. Customs officials relating to the shipment of products from overseas locations. By way of another example, the Company was unable to access or respond to customer communications, which undermined and disrupted customer relationships, and caused the Company to suffer business disruptions and lose customers that destroyed its business.

64.    The Company passwords, emails, financial records and business records constituted essential business assets integral to Company operations. The Company's data, designs and email histories had commercial value and constituted intangible property.

65.     As a further example, Kathie Larrea had a meeting with one of the Company's largest customers, Walmart. After she resigned, she failed to share the Walmart order information with the Company, Holding Corp. and the Bochis. They contacted Kathie, asking her to provide access for the Company email accounts so that the Company could complete the sale and pursue its business with Walmart and other companies. She refused to respond to their emails.

66.     Moreover, because the Larreas blocked their access to the email accounts, they had no way to even know that Walmart had been prepared to place substantial orders with the Company for the spring 2019 season. As a direct result of such wrongful conduct, the Company lost a significant business opportunity. Holding Corp. and the Bochis on behalf of the Company continued to seek administrative access to Company records from the Larreas, but the Larreas refused to provide such access, and refused to update Company records and withheld crucial Company business information.

67.     The ability of the Company's personnel to access email accounts, computer passwords and other business data was essential to maintaining the Company's ongoing operations. The Larreas' continued refusal to provide administrative access to Company email accounts and Company records directly caused the loss of orders from Walmart and other customers.

68.     On July 30, 2018, the Bochis were advised by the landlord for the Company's office located at Suite 404, 1412 Broadway, New York, New York ("office") that Kathie Larrea had entered the office in or about early July 2018, which was after the Larreas had resigned. She entered the office without the Bochis' knowledge or consent.

69.     On or about August 31, 2018, the Bochis made arrangements to empty the office's contents and terminate the office lease with the building. On the same day, Peter Bochi discovered that three computers were missing from the office. When advised by the Larreas that they did not

know why the computers were missing, the Bochis filed a police report concerning the theft of the three computers. There was no sign of a break-in, and nothing was missing from the office except for the computers.

70.     The three computers contained the Company's important, highly confidential business-related information, and such missing information deprived the Company of the ability to carry on its operations. The missing computers contained all of the Company's designs needed to continue its operations. Under these circumstances, the thief's sole motivation would incredibly appear to be, above all else, to deny access to the computers to the Bochis.

71.     Upon information and belief, Kathie Larrea took the three computers when she entered the office in early July 2018 in order to deny the Company access to the computers. Upon information and belief, Kristie Larrea knew, approved of and otherwise supported Kathie Larrea's actions in removing the computers from the Company's offices.

**D.  The forensic accountant's expert opinion in the State Court Action**

72.     On November 19, 2018, the Company, Quebec Inc. and Holding Corp. sued the Larreas, Mehjeez and other defendants in the Supreme Court of New York, New York County, Commercial Division, Index No. 655786/2018 ("State Court Action").

73.     On January 6, 2025, in the State Court Action, the Company served the expert report of forensic accountant Rebecca Fitzhugh, CPA/CFF, CFE, CIT, CIGA. A copy of the expert report is annexed hereto as **Exhibit B**. Ms. Fitzhugh's analysis resulted in the following conclusions:

> Based upon applicable accounting standards, my education and experience, the information made available to me, my examination of publicly available data, and the analysis described herein, it is my professional opinion as a forensic accountant that the actions and omissions of the Defendants, in particular their failure to provide the Bochis with sufficient financial, business, and accounting data to allow them to appropriately monitor and manage the Company's financial condition,

were not consistent with their fiduciary duty and duty of loyalty to Plaintiff. Defendants' actions were not in the best interest of the Company.

74.    The Larreas did not respond to Ms. Fitzhugh's expert report by way of a responding expert report or otherwise. Her expert opinion is unrebutted.

**E.  The Larreas' bankruptcy filings**

75.    On August 26, 2025 ("Petition Date"), Debtor filed a voluntary petition for relief under chapter 7 of title 11, United States Code, 11 U.S.C. §§ 101 et seq., in the United States Bankruptcy Court for the Eastern District of New York ("Court"). Debtor's sister also filed a Chapter 7 bankruptcy petition in the Court on the same day.

<u>**FIRST COUNT**</u>

**(Non-Dischargeability – 11 U.S.C. § 523(a)(4))**

76.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if set forth at length herein.

77.    In the event that Kathie Larrea denies acting as a Manager on the Company's Board of Managers, Debtor acted as the Manager designated by the Larreas and Mehjeez on the Company's Board of Managers. By virtue of her role as a Manager on the Company's Board of Managers, Debtor acted in a fiduciary capacity with respect to the Company.

78.    By virtue of withholding Company passwords, barring access to Company emails, financial records and business records, refusing to input the Company's business information into the G&A accounting system, withholding information about orders from Walmart and other Company customers and removing three computers from the Company premises, Debtor wrongfully exercised control over property belonging to the Company and intentionally committed wrongful acts, or alternatively, consciously disregarded or was willfully blind to a substantial and

unjustifiable risk that her conduct violated the fiduciary duties that she owed to the Company as a Manager.

79.     Based on the foregoing, Debtor committed defalcation while acting in a fiduciary capacity with respect to the Company.

80.     In the alternative, the Company passwords, emails, financial records, business records, information about orders from Walmart and other Company customers and three computers constituted essential business assets integral to Company operations that were entrusted to Debtor. Debtor fraudulently or deceitfully appropriated such Company property to her own use with the intent to permanently deprive the Company of such property and committed embezzlement with respect to such Company property.

81.     In the alternative, the Company passwords, emails, financial records, business records, information about orders from Walmart and other Company customers and three computers constituted essential business assets integral to Company operations. Debtor intentionally and wrongfully took such Company property without authorization and committed larceny with respect to such Company property.

82.     As a direct and proximate cause of Debtor's actions, Plaintiff has suffered damages in an amount equal to its lost business opportunities, lost business continuity, lost company value, lost customers, lost business information and replacement value of missing data, with the precise amount to be proven at trial.

WHEREFORE, Plaintiff demands judgment against Debtor as follows:

a.     Determining that Debtor is liable to Plaintiff for damages;

b.     Determining that the liabilities owed by Debtor to Plaintiff are not subject to discharge pursuant to 11 U.S.C. § 523(a)(4);

c.     For costs of suit, attorneys' fees and expenses; and

d.      for such other and further relief as the Court deems just and proper.

## SECOND COUNT

### (Non-Dischargeability – 11 U.S.C. § 523(a)(6))

83.      Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if set forth at length herein.

84.      Debtor's actions described in this Complaint were willful and malicious and caused injury to Plaintiff.

85.      The Company passwords, emails, financial records, business records, information about orders from Walmart and other Company customers and three computers constituted essential business assets integral to Company operations that were entrusted to Debtor.

86.      By withholding Company passwords, barring access to Company emails, financial records and business records, refusing to input the Company's business information into the G&A accounting system, withholding information from the Company about orders from Walmart and other customers and removing three computers from the Company premises, Debtor harmed the Company.

87.      Debtor knew or should have known that her conduct would cause damages to the Company.

88.      Debtor acted with subjective intent to injure Plaintiff or, at a minimum, with subjective knowledge that her conduct was substantially certain to cause injury to Plaintiff.

89.      Debtor's actions were malicious because they were wrongful and without any plausible business justification or other just cause or excuse.

90.      Debtor's actions demonstrated a conscious disregard of Plaintiff's rights.

91.      As an actual and proximate result of Debtor's willful and malicious actions, Plaintiff has suffered damages in an amount equal to its lost business opportunities, lost business

continuity, lost company value, lost customers, lost business information and replacement value of missing data, with the precise amount to be proven at trial.

WHEREFORE, Plaintiff demands judgment against Debtor as follows:

a.      Determining that Debtor is liable to Plaintiff for damages;

b.      Determining that the liabilities owed by Debtor to Plaintiff are not subject to discharge pursuant to 11 U.S.C. § 523(a)(6);

c.      For costs of suit, attorneys' fees and expenses; and

d.      for such other and further relief as the Court deems just and proper.

Dated: December 5, 2025

/s/ *Curtis M. Plaza*
RIKER DANZIG LLP
Curtis M. Plaza
Edwin F. Chociey, Jr.
John J. Harmon
489 Fifth Avenue, 33rd Fl.
New York, NY 10017-6111
Telephone: (212) 302-6574
Facsimile: (212) 302-6628
cplaza@riker.com
echociey@riker.com
jharmon@riker.com

Attorneys for Plaintiff

# EXHIBIT A

## TERM SHEET OF OPERATING AGREEMENT OF
## 2 GIRLS ACCYS LLC, A NEW YORK LIMITED LIABILITY COMPANY

NOTE: 2 Girls ACCYS LLC, a New York limited liability company (the "Company") was previously formed as a New York corporation and did business as "2 GIRLS HOLDING CORP.", f/k/a "2 Girls Accys Inc." ("2 Girls Corp."). The ownership of shares in 2 Girls Corp. before the Formation Date were owned by the following entities in the following percentages: (i) 9281-5109 QUEBEC INC. ("9281-5109") – 64.5%, (ii) Mehjeez Designs, LLC ("Mehjeez") – 25.5% and (iii) the NATANEL TRUST, a trust for the benefit of Aaron Goshzini ("Aaron") and Nir Goshzini ("Nir"), as contingent beneficiary in the event that Aaron dies before attaining the age of 25 years, (the "Trust", which term shall be deemed to include its successors and/or assigns) – 10%. All assets, rights, title and interest were transferred to the Company on or about July 3, 2017 (the "Formation Date"). From and after the Formation Date, all shares in 2 Girls Corp. held by Mehjeez and the Trust shall be deemed forfeited or otherwise deemed transferred to 9281-5109.

1. Kathie Larrera ("Kathie") and Kristie Larrera ("Kristie") will both be hired by the Company pursuant to written employment agreements, Kathie as Director of Operations and Kristie as Director of Sales and Design, which employment agreements shall only be terminable for "cause" as such term is defined in such employment agreement. Duties will be those customarily ascribed to such job titles. Kathie and Kristie will work exclusively for the Company and not for their own account or any other party nor will they accept compensation of any sort from suppliers, vendors or customers.

2. Effective as of January 1, 2017, Kathie will receive a salary at the rate of $150,000 per annum and Kristie will receive a salary at the rate of $180,000 per annum. The Company shall pay one-half (1/2) of any arrears owing to them for the period January 1 to the date of their first paycheck at the new rate on or before July 31, 2017 and the remainder on or before September 30, 2017. Any salary increases to Kathie and/or Kristie, and any salaries payable to the principals of 2 Girls Corp., or to Abe Bochi or Peter Bochi or to members of their respective families, or to the principals of the Company, or to the principals of 2 Girls Corp. or to members of their respective families or to Kathie and Kristie's family shall be commensurate with their respective job responsibilities, experience, and the value of their services to the Company.

3. Upon the full execution of the Company's operating agreement, Kathie will immediately assign to the Company all her right, title and interest in the domain name "2girlsaccessories.com" and website, any associated email accounts and all other intellectual property associated with the Two Girls brand, including but not limited to trade names, trademarks, etc.

4. 2 Girls Corp. will be deemed to have contributed the entirety of the existing business to the Company in exchange for 64.5% of the membership interests. Mehjeez will

be deemed to have acquired a 25.5% membership interest in the Company in exchange for a contribution of $255 to the Company, and the Trust will be deemed to have acquired a 10% membership interest in the Company for a contribution of $100.

5. Provided Kathie and Kristie's employment has not been terminated by the Company for cause, as defined in their employment agreements, or by them without "good reason" as such term is customarily defined in employment agreements, once the Company Loan Obligation, hereinafter defined, has been satisfied, Mehjeez will have the right to purchase or subscribe to up to an additional 14% of the Company's membership interests (the "Additional Membership Interests"), at their fair market value, based on an independent appraisal or, if greater, based on a bona fide third party offer. At the option of 2 Girls Corp., Mehjeez shall purchase the Additional Membership Interests from 2 Girls Corp. or shall subscribe to same from the Company, provided that in such latter event, the membership interests of the Trust shall not be diluted by the exercise of this option. The option will be effective for a period of twenty-four (24) months from the date 2 Girls Corp. notifies Mehjeez and the Trust in writing that the Company Loan Obligation has been satisfied. If Kathie and Kristie's employment has been terminated by the Company without cause or by them with good reason, prior to satisfaction of the Company Loan Obligation, Mehjeez shall retain the option described in this paragraph for a period of twenty-four (24) months from the date of termination of their employment should the Company Loan Obligation be satisfied during that time.

6. Under no circumstances will the membership interest of the Trust be diluted, whether by the issuance of additional units of membership to current members, new members, or by any other event. In the event of the issuance of additional units of membership, the Trust shall receive at no cost additional units of membership to insure that the Trust's interest is not diluted. No member may pledge its Membership Interest in the Company as collateral for any loan or for any purpose whatsoever other than as set forth in this section.

7. No bonuses will be payable to Kathie and Kristie, no profits or dividends will be distributable to members unless all loans advanced by 9281-5109, 2 Girls Corp. or affiliates of 9281-5109 to the company have been repaid in full, plus interest at the rate of 4% per annum (the "Company Loan Obligation"). As of the date of this Term Sheet, the principal amount of such loans total US $1,621,750.09 (the "Total Loan"). Any loans made by 2 Girls Corp., or any affiliate thereof, to the Company on or after the date hereof, shall be loaned to the Company at an interest rate not to exceed 5% per annum. No additional loans will be advanced to the Company by 9281-5109, 2 Girls Corp. or by any affiliate of 2 Girls Corp. without the prior written approval of all of the members. Any loans from any source which cause the aggregate amount of all loans to be in excess of $1,500,000 shall require the prior written approval of all of the members, which shall not be unreasonably withheld, conditioned or delayed. Upon the Company's repayment of the loans made to the Company by 9281-5109, the Company shall be required to distribute to all members

2

no less than 50% of its net profits, no less frequently than annually. In the event that the Company chooses to not pay off loans despite its financial ability to do so, the Company shall be required to distribute to all members no less than 50% of its net profits, no less frequently than annually, despite the fact that all loans have not been repaid, unless all members agree in writing to suspend such requirement for any period of time.

8. No loans to the Company which aggregate more than $300,000 in any 12 month period of time, will be made to the Company absent the prior written consent of each of the members, which consent shall not be unreasonably withheld, conditioned or delayed. In the event a member does not respond to a request for consent to a loan within the longer of two (2) business days or forty-eight (48) hours after receiving such request for consent, the loan shall be deemed approved by such member.

9. The Company will have two managers, one designated by 2 Girls Corp. and one designated by Mehjeez. All decisions will require the affirmative vote of both managers, provided that, (i) subject to any restrictions or limitations imposed by the Company's institutional lender, if any, the manager designated by Mehjeez may, in good faith, direct the Company to make payments on account of the Company Loan Obligation out of available profits, and (ii) the manager designated by 2 Girls Corp. may, in good faith, make all decisions regarding "cause" under Kathie and Kristie's employment agreements, provided that Kathie and Kristie shall retain their right to object to such decision(s) in their capacity as employees. Once the Company Loan Obligation has been satisfied, the managers shall cause the distribution annually of not less than 50% of the net profits of the Company to its members, however, if all members agree in good faith that such distributions would leave the Company with insufficient cash, for the ongoing operations of the Company, the members may unanimously agree to reduce the distributions to less than 50% of the net profits of the Company after reserving sufficient cash, as determined by all of the Members in good faith, for the ongoing operations of the Company. For the purpose of clarity, the Members expressly acknowledge that notwithstanding anything herein to the contrary, the Managers shall not be required to make any distributions which the Members unanimously agree would likely cause the Company financial hardship or otherwise reasonably lead the Company into a situation in which the Company will be required to obtain one or more loans to fund the operations or pending purchase orders of the Company. Credit terms offered by suppliers to the Company shall not be considered loans for the purposes of this section.

10. Subject to the requirement for joint approval referred to in paragraph 7, Kathie and Kristie will superintend the day-to-day operations of the company. "Day-to-day" operations shall not include issuing purchase orders for merchandise, which shall require prior written approval by Abe Bochi, Peter Bochi or Earl Levett after presentation of a copy of the proposed purchase order with explanation of landed cost, sales price per unit, number of committed units sold and gross profit percentage (the "Order Information"), provided, however: that (i) such approval or lack thereof shall be made in timely fashion and in good faith by Abe Bochi, Peter Bochi or Earl

3

Levett and (ii) the failure of Abe Bochi, Peter Bochi or Earl Levett to approve, disapprove or reasonably request additional information with regard to a proposed purchase order within forty-eight (48) hours after receiving the Order Information shall be deemed an approval of the order. Kathie and Kristie shall also furnish the manager(s) and the Trust and Nir with periodic reports on the Company's general business activities and continue to observe all other procedures currently in place.

11. The Trust shall have the right, at its sole cost and expense, upon reasonable notice to the Company and without undue interruption of the Company's business, to audit the Company's financial statements no more frequently than quarterly. The Company shall cooperate with the Trust and/or its accountants performing the audit(s) for the Trust and shall grant reasonable access to the Company's books and records necessary to perform such audit(s). In addition, all members shall have access to and copies of the Company's books and records (whether in hard copy or electronic format), including but not limited to sales reports, cost of goods sold, margins. All members, including those holding a minority interest in the Company ("minority Member"), shall have access to and receive copies of all the Company's reports provided to the Board of Directors and all the Company's reports provided to the members holding in the aggregate 50% or more of the Company's units of ownership ("majority Members"), as and when provided to the Board of Directors and/or to the majority Members. The Company's management shall be required to provide information and reports responsive to any requests that may be made by the minority Member, pertaining to the operations of the business, including but not limited to the Company's customer orders, pricing, costs, sales prices, etc.

12. A breach of fiduciary duty to the Company by Kathie, Kristie, Nir, Abe Bochi or Peter Bochi, whether as employee, consultant, member or manager, which breach is not, or cannot be, cured within thirty (30) days after written notice to the breaching party, will result in the entity with which such person is affiliated: (i) being subject to a claim by the Company for damages caused by such breach of fiduciary duty to the Company, and (ii) a forfeiture of any and all rights to: (a) exercise consent rights set forth in this Term Sheet, (b) engage in any management related activity, and (c) receive any confidential or proprietary information of the Company, including without limitation, financial information, pricing and sourcing details, artwork and designs . Without limiting the foregoing, neither Nir nor anyone acting on behalf of the Trust, nor Kathie, Kristie, Abe Bochi or Peter Bochi, or the entity with which such person is affiliated shall not, except in connection with a good faith exercising of the Trust's rights in connection with paragraphs 13(a) or 15 below, disclose or otherwise provide to third parties, including without limitation competitors of the Company, confidential or proprietary information of the Company, including financial information, pricing and sourcing details, artwork and designs. Notwithstanding the foregoing, the disclosure of information, artwork and/or designs reasonably required to manufacture or to purchase from any manufacturer or supplier, any product for the Company, shall not constitute a breach of fiduciary duty to the Company, regardless of whether or not any competitors of the Company who may visit any factory or facility manufacturing or assembling products for the

4

Company ever see or learn of any of the Company's information, artwork and/or designs or products being manufactured or assembled at any such factory or facility. Prior to Nir or Aaron accepting a position as employee, independent contractor, or consultant with a direct competitor of the Company, Nir or Aaron shall offer the Company a right of first refusal to hire such person as employee, independent contractor, or consultant with the Company on the same terms. If Nir or Aaron at any time becomes employed by or affiliated with a competitor of the Company, whether as employee, independent contractor, consultant, owner, co-owner, shareholder, partner, member or otherwise (hereinafter collectively "employment or affiliation" or "employed or affiliated"), such employment or affiliation will not, by itself, constitute a breach of fiduciary duty, and neither the Company nor any Member may sue Nir or Aaron or the Trust for breach of fiduciary duty as a result of such employment or affiliation with a competitor of the Company. Notwithstanding the foregoing, Nir's or Aaron's (or any assignee or successor of the Trust's) employment or affiliation with a direct competitor of the Company, will cause Nir's and/or Aaron's and/or the Trust's rights to access to the Company's records to be limited to the books and records required to be provided to members pursuant to the New York Limited Liability Company Law. Such limitation shall only remain in effect during such employment by or affiliation with a direct competitor of the Company.

13. No lifetime transfers of membership interests (which, for these purposes, includes a change of control of Mehjeez, 2 Girls Corp., 9281-5109, or a change of beneficiary of the Trust to someone other than Aaron or, Nir or a member of Nir's family) may be made except as follows:

    (a) If 2 Girls Corp. desires to sell its membership interests, it shall first offer to sell to Mehjeez and the Trust, who shall collectively have the right to purchase such membership interests in proportion to their membership interests In the event that either Mehjeez or the Trust does Not elect to purchase such membership interests in proportion to their membership interests in the Company, then the other member (Mehjeez or the Trust) shall have the right to purchase the remainder of 2 Girls Corp.'s membership interests in the Company on the same terms as stated herein, No increase in the Trust's percentage ownership of the Company shall entitle the Trust to management rights in the Company, unless the Trust's total membership interests in the Company is equal to or greater than 50% of the total outstanding membership interests in the Company. If the parties fail to reach an agreement, 2 Girls Corp. may notify Mehjeez and the Trust (a "Trigger Notice") of its intention to sell its membership interests or the entire company to a third party, in which case, it may require the other members to sell on the same terms, provided that (i) if the third party offer is the same or less favorable than the last offer made by Mehjeez and/or the Trust, Mehjeez and/or the Trust will have the right to match the third party offer, and (ii) each of Mehjeez and the Trust shall, during the period 2 Girls Corp. is seeking a third party offer, have the right to find a third party offer more favorable than their last offer, in

5

accordance with the terms more fully set forth in paragraph 14 (reasonably modified as so as to be applicable to this paragraph, in which event, the Company and all its members shall be required to sell their ownership interests in the Company to the person or entity making the more favorable offer. In the event that the business operated by the Company is sold, or any assets of the business (excluding inventory) are sold, including but not limited to any division, brand, product line, category of apparel or product, trademark, or any intellectual property owned by the Company, each Member will receive their proportionate share of the purchase price of the business or other assets which are sold, based upon the units of ownership each Member owns at the time of the sale (unless all Members unanimously agree to retain all or a portion of the proceeds of the sale of such assets as working capital) and (iii) the Trust shall have the same rights to secure a more favorable offer for such assets, and in the event that the Trust secures an offer to purchase such assets at a purchase price greater that the offer presented by any other member, or by any third-party, unanimous written consent of all members shall be required in order to accept any offer that is less than the purchase price offered by the prospective buyer secured by the Trust, unless the other members agree in writing that the Trust will receive the Trust's proportionate share of the purchase price for such assets offered by the prospective buyer secured by the Trust; and iv) if the option described in paragraph 5 has terminated because Kathie and Kristie's employment has been terminated by the Company for cause or by them without good reason, Mehjeez shall no longer have any rights under this paragraph 13(a);

(b) Notwithstanding any of the foregoing terms, or any other term in this agreement regarding the sale or purchase of the Company's entire business, or all members' ownership interests in the Company, in the event that all or a portion of the purchase price is paid by a promissory note or other method of payment over time, the Trust shall be paid in cash prior to the other Members. In order to accomplish this priority of payment, the Trust shall be entitled to receive its share of the purchase price out of the cash payments made by the purchaser to the Company or to the Company's members, including but not limited to up-front cash payments and installment payments.

(c) If 2 Girls Corp. or Mehjecz wishes to buy the other's interest in the company, it shall make an offer, and the non-offering party shall have the right to sell on the terms of such offer or purchase the membership interests of the offering party on such terms (adjusted proportionately according to the percentages). The Trust shall have the option to sell its membership interests in the Company on the same terms. If the trust exercises such option, the purchasing party shall be required to purchase the Trust's membership interests in the Company on the same terms (adjusted proportionately according to the percentages).

6

   (d)  If the Trust desires to sell its membership interests, it shall first offer to sell to 2 Girls Corp. and Mehjeez, who shall collectively have the right to purchase such membership interests in proportion to their membership interests. If the Trust, 2 Girls Corp. and/or Mehjeez are unable to reach agreement, the Trust may sell its membership interests to a third party, provided that if the third party offer is the same or less favorable than the last offer made 2 Girls Corp. or Mehjeez, 2 Girls Corp. and Mehjeez will each have the right to match the third party offer.

   (e)  If the Company is sold to a third party for a purchase price that includes a combination of cash, notes and/or securities, each of the members (other than the Trust, which shall be paid in cash prior to the other Members) shall receive a portion of each class of consideration in accordance with its percentage ownership of the Company.

14. If 2 Girls Corp. has given a Trigger Notice to Mehjeez and the Trust, each of them shall have the right during the Bid Period, hereinafter defined, to obtain a superior offer to any offer obtained by and deemed satisfactory by 2 Girls Corp. Whether an offer is "superior" shall be determined in good faith by the members other than the member that secured the offer, it being understood that a superior offer is not necessarily an offer for a greater purchase price and that the composition of the purchase price (*e.g.,* cash, notes, securities), credit worthiness of the purchaser and timing are among the factors to be considered. The "Bid Period" shall commence on the date 2 Girls Corp. has given a Trigger Notice and shall continue until the later of (i) 90 days from the date of the Trigger Notice or (ii) five (5) business days from the date any member presents to the others a written offer the presenting member deems satisfactory. Provided a prospective buyer has executed a confidentiality agreement reasonably satisfactory to the managers of the Company, each of the members may furnish to such prospective buyer confidential and proprietary information about the Company, and in such event, managers shall make available to the Trust the same information available to the other members. Notwithstanding any of the foregoing terms, or any other term in this agreement regarding the sale or purchase of the Company's entire business, or all members' ownership interests in the Company (collectively "sale of the Company" or "purchase of the Company"), in the event that the Trust secures an offer to purchase the Company at a purchase price greater that the offer presented by any other member, or by any third-party, unanimous written consent of all members shall be required in order to accept any offer that is less than the purchase price offered by the prospective buyer secured by the Trust, unless the other members agree in writing that the Trust will receive the Trust's proportionate share of the purchase price offered by the prospective buyer secured by the Trust.

15. In the event of death of a member (which in the case of the Trust, means the death of Aaron or, in the event that Aaron dies before attaining the age of 25 years, the death of Nir; in the case of Mehjeez, means the death of the second to die of Kathie and Kristie; and in the case of 2 Girls Corp., means the death of the second to die of Abe Bochi and Peter Bochi), the surviving members shall have the right to purchase the

7

membership interests of the deceased member, and if the members do not purchase all such interests, the Company shall purchase the remainder, provided, however, that the Trust shall have the right to retain its interest notwithstanding the rights of the surviving members or the rights or obligations of the Company. The redemption price for the membership interests of a deceased member will be an amount equal to their fair market value, based on an independent appraisal or, if greater, a bona fide third party offer. The redemption price for the membership interests of a deceased member shall be paid on or before the later to occur of (i) 15 days after the Company collects any insurance proceeds payable to the Company by reason of the death of the deceased Member; and (ii) 90 days after the date of death of the deceased Member.

16. No member may pledge or otherwise encumber its membership interest as security for a loan except as collateral security for a loan to the Company.

17. The managers shall have full discretion to admit additional members to the Company provided, however, that the Trust's percentage ownership of the Company may not be diluted by any new member. In addition, the Company may not issue additional units of ownership, without providing a proportionate number of units of ownership to the Trust at no cost, so as to insure that the Trust's interest in the Company shall remain at no less than 10% of the total units of ownership issued and outstanding.

18. All members shall be entitled to receive a proportionate share of all distributions to members made by the Company, in accordance with their ownership interest.

19. In the event that there is a change in the trustee of the Trust, the Company shall make any necessary changes in its books and records, and shall issue a replacement certificate for the units of ownership reflecting the change in the trustee of the Trust, if requested by the Trust member, without any charge for issuing the new stock certificate and cancelling the old stock certificate.

20. This Term Sheet shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision hereof shall be prohibited or invalid under any such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating or nullifying the remainder of such provision or any other provisions of this Term Sheet. If any one or more of the provisions contained in this Term Sheet shall for any reason be held to be excessively broad as to the activity or subject, such provisions shall be construed by limiting and reducing it so as to be enforceable to the maximum extent permitted by applicable law. This Term Sheet shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to its conflicts of laws principles.

21. Regardless of the state in which any party resides at the time this agreement is executed, or at the time of commencement of any lawsuit to enforce this agreement, the parties acknowledge and agree that the Company is doing business in the State of New York, and that by reason of entering into this agreement, each party to this

8

agreement is doing business in the State of New York, to an extent that subjects them to the jurisdiction of the Courts of the State of New York. Furthermore, the parties agree that the Courts of the State of New York have both personal jurisdiction over all parties hereto, and subject matter jurisdiction over any controversy that may arise out of or in connection with this agreement, or any activities relating to this agreement. All parties to this agreement hereby waive any defense of lack of subject matter jurisdiction, and any defense of lack of personal jurisdiction, other than based upon failure to effectuate service of process upon a party. Any proceeding arising out of or relating to this Term Sheet or the transactions contemplated hereby shall be brought only in the Supreme Court of the State of New York, County of New York. In the event that a lawsuit commenced in the Supreme Court of the State of New York, County of New York is dismissed for lack of jurisdiction over a party, or lack of subject matter jurisdiction, the parties may commence litigation in the Federal District Court in the State of New York, in the County of New York. This agreement may be filed with any court as written evidence of the knowing and voluntary irrevocable agreement between the parties to waive any objections to jurisdiction, to venue or to convenience of forum.

22. The members hereby agree and acknowledge that the members shall at all times act in good faith in exercising their rights set forth in this Term Sheet, and no member shall unreasonably withhold, condition or delay any consent which is needed from such member pursuant to the terms of this Term Sheet.

23. This Term Sheet may be executed in one or more counterparts, and with counterpart facsimile signature pages, each of which shall be an original, but all of which when taken together shall constitute one and the same Term Sheet. Counterpart signature pages to this Term Sheet transmitted by facsimile transmission, by electronic mail in "portable document format" (".pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, will have the same effect as physical delivery of the paper document bearing an original signature.

24. This Term Sheet is intended to be an outline of terms and conditions for the transactions among the parties, forming the basis for definitive agreements with respect thereto. Until such time as the parties execute and deliver such definitive agreements, they shall conduct the business of the Company and their mutual relationship in a manner consistent with the terms of this Term Sheet and shall otherwise be bound hereby.

25. Notices: All notices and other communications that are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given or made, as follows:

    a. if by hand, immediately upon delivery; or

b. if by Federal Express, Express Mail or any other overnight delivery service, one business day after dispatch, or

c. if by email, on the date the email is sent, provided that the email is not returned or otherwise undeliverable.

All notices, requests, and demands are to be given or made to the parties at the addresses set forth at the beginning of this Agreement (or to such other addresses as any party may designate by notice in accordance with the provisions of this paragraph), or to the parties' respective email addresses as follows:

a. to the Trust, by email to: nir.goshzini@accessorydesignz.com or to any other email address as provided to the Company;

b. to 2 Girls Corp., by email to the following email address: Abe.Bochi@bochibrothers.com or to any other email address as provided to the Company;

c. to Mehjeez, by email to the following email addresses:
Kathie Larrea: kathiel@2girlsaccessories.com or to any other email address as provided to the Company;
Kristie Larrea   kristiel@2girlsaccessories.com, or to any other email address as provided to the Company;

[Signature Page to Follow]

10

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Term Sheet as a sealed instrument as of the date first above written.

**9281-5109 QUEBEC INC.**

By: _____
Name: Abe Bochi
Title: President

**MEHJEEZ DESIGNS, LLC**

Name: Kathie Carree
Title: Member / President

**NATANEL TRUST**

By: _____
Nir Geslei Ni                  , Trustee

09/28/2017

**2 GIRLS CORP.**

By: _____
Name: Abe Bochi
Title: President

11

3426244 v5

# EXHIBIT B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| 2 Girls ACCYS LLC, 2 Girls Holding Corp. and 9281-5109 Quebec Inc., )<br><br>Plaintiffs )<br>vs. )<br><br>Kathie Larrea, Kristie Larrea, Mehjeez Designs, LLC, Simply Girls Accys LLC, Madison Lifestyle LLC, EMD Group Inc., John Does 1-10 and ABC Corps. 1-10, )<br><br>Defendants/Counterclaimants | Index No. 655786/2018 |

**EXPERT REPORT OF**
**<u>REBECCA FITZHUGH</u>**

# TABLE OF CONTENTS

I.      **INTRODUCTION** ..................................................................................................... **3**

    A.   Assignment ..................................................................................................................3

    B.   Qualifications ...............................................................................................................3

    C.   Compensation..............................................................................................................4

    D.   Documents and Information Considered .....................................................................4

    E.   Status ..........................................................................................................................4

    F.   Assumptions and Limitations......................................................................................4

II.     **SUMMARY OF OPINION** .......................................................................................... **5**

III.    **BACKGROUND**......................................................................................................... **5**

      A. The Parties..................................................................................................................5

      1. 2 Girls ACCYS LLC.......................................................................................................5

      2. Kathie Larrea ............................................................................................................6

      3. Kristie Larrea ............................................................................................................6

      4. Mehjeez Designs, LLC ...............................................................................................6

      5. Dispute .....................................................................................................................6

IV.    **ANALYSIS OF THE MATTER** ..................................................................................... **7**

    A.   Allegations of Breach of Fiduciary Duty and Duty of Loyalty..........................................7

V.     **CONCLUSIONS**....................................................................................................... **12**

# Exhibits

EXHIBIT A      Curriculum Vitae of Rebecca Fitzhugh

EXHIBIT B      Documents and information considered

EXHIBIT C      Second Amended Complaint

EXHIBIT D      Transcript of deposition of Kristie Larrea, October 24, 2024, 8:2-6, 23-9:16

EXHIBIT E      Transcript of deposition of Kristie Larrea, October 24, 2024, 47:14-19; 64:19-65:13

EXHIBIT F      Transcript of deposition of Kathie Larrea, October 25, 2024, 8:8-20

EXHIBIT G      Transcript of deposition of Kathie Larrea, October 25, 2024, 9:11-13:7

EXHIBIT H      Transcript of deposition of Kathie Larrea, October 29, 2024, 48:11-12

EXHIBIT I      Transcript of deposition of Peter Bochi, October 17, 2024, 38:24-41:2

EXHIBIT J      Transcript of deposition of Kathie Larrea, October 25, 2024, 30:2-8, 33:15-18

EXHIBIT K      MEHJEEZ34396, 34422-3

EXHIBIT L      Transcript of deposition of Peter Bochi, October 17, 2024, 91:12-14

EXHIBIT M      Transcript of deposition of Kathie Larrea, October 25, 2024, 35:9-11, 21-23, 36:10-18

EXHIBIT N      MEHJEEZ34653-5

EXHIBIT O      MEHJEEZ34662-7

EXHIBIT P      MEHJEEZ34192-4

EXHIBIT Q      MEHJEEZ34381-3, 34394-5, 34455

EXHIBIT R      P9167-71

EXHIBIT S      Transcript of Deposition of Abe Bochi, December 10, 2024, 235:24-237:9, 281:15-293:21

EXHIBIT T      Transcript of Deposition of Abe Bochi, October 16, 2024, 97:17-98:6, 111:2-12, 112:13-114:16

EXHIBIT U      P4848-53, P9153-9160

EXHIBIT V      Reply affidavit of Abe Bochi, December 19, 2018

EXHIBIT W      MEHJEEZ34594-34601

## I.    Introduction

### A.  Assignment

1.  Riker Danzig LLP ("Riker") has engaged CliftonLarsonAllen LLP ("CLA") to perform forensic accounting services on behalf of 2 Girls ACCYS LLC ("Plaintiff" or "Company") in the above-referenced matter. Our assignment was to assess the actions of Kathie Larrea, Kristie Larrea, and Mehjeez Designs, LLC (collectively, "Defendants") with respect to provision of the financial, business, and accounting data of the Company to the Plaintiff.

2.  This report sets forth my opinions about which I expect to testify at trial, if asked to do so, along with the basis and reasons for these opinions based on my assignment, the documents and information I have reviewed, and my analysis as of January 6, 2025.

### B.  Qualifications

3.  I am a Certified Public Accountant with more than 23 years of experience advising clients on a variety of subjects including financial disputes. I am currently a Signing Director at CLA, a national professional services firm with more than 8,000 professionals. CLA was formed in 2012 through the merger of regional firms Larson Allen and Clifton Gunderson. Prior to joining CLA, I was a Member of the Firm at Sobel & Co., LLC, a regional accounting, tax, and advisory firm that was acquired by CLA in 2023.

4.  Over the course of my career, I have provided professional services to clients in a variety of industries, including construction, manufacturing, financial services, and e-commerce. I have specialized in forensic accounting and litigation support since approximately 2004 and have gained experience analyzing economic damages and investigating complex financial matters during this time.

5.  I received my Bachelor of Arts degree with a major in Political Science from Union College in 1990, and a Master of Business Administration degree in Marketing from the State University of New York at Binghamton in 1993. I completed thirty credits in accounting and taxation at Seton Hall University in 2001. I was licensed as a Certified Public Accountant in New Jersey in 2002, became

a Certified Fraud Examiner in 2003, and I hold the Certified in Financial Forensics credential granted by the American Institute of Certified Public Accountants ("AICPA").

6.    A copy of my current CV including my publications and testimony is attached as **Exhibit A**. As listed on my CV, I previously have been qualified as an expert by Courts in New Jersey and New York and by various arbitration tribunals.

### C.  Compensation

7.    CLA is being compensated for the services performed in connection with this assignment based upon CLA's hourly billing rates plus expenses. Our fees are not contingent upon my opinions or the outcome of this assignment. My current billing rate for this engagement is $500 per hour.

### D.  Documents and Information Considered

8.    As part of my analysis, I have reviewed documents produced by Plaintiff and Defendants, pleadings, depositions, and publicly available information. The previous are all types of information reasonably relied upon by experts in my field for the purposes of analyzing data and forming opinions on matters such as those that are the subject of my work in this case. A complete listing of the documents that I have considered is attached as **Exhibit B** of this report.

9.    The citations in this report to facts, events, and other things are intended to be representative, and such citations do not constitute an exhaustive list of all the documents and information that may support such facts, events, or other things.

### E.  Status

10.    My opinions are based on the documents and information reviewed and analysis performed to date. I reserve the right to supplement and/or amend this report to the extent that additional information and/or data become available to me.

11.    At trial, I may use various demonstrative exhibits based on information contained in this report and supporting material.

### F.  Assumptions and Limitations

12.    I performed my analysis utilizing the following assumptions and subject to certain limitations.

13.     My analysis is based on the following assumptions:

     a.   The Defendants had a fiduciary duty and duty of loyalty to the Plaintiff.

14.     My analysis was limited due to:

     a.   The lack of production of a complete set of accounting books and records for the business.

## II.     Summary of Opinion

15.     Based on my review and analysis to date based on currently available information, and for the reasons that will be explained in detail in this report, it is my professional opinion as a forensic accountant that the actions and omissions of the Defendants, in particular their failure to provide Abe Bochi and Peter Bochi (collectively, "Bochis") with sufficient financial, business, and accounting data to allow them to appropriately monitor and manage the Company's financial condition, were not consistent with their fiduciary duty and duty of loyalty to Plaintiff. The Defendants' actions and omissions were not in the best interest of the Company.

## III.     Background

16.     This section provides an overview of the Parties and the Dispute.[1]

### A.     The Parties

17.     The Plaintiff in this dispute is 2 Girls ACCYS LLC, and the Defendants are Kathie Larrea, Kristie Larrea, and Mehjeez Designs, LLC.

### 1.     2 Girls ACCYS LLC

18.     2 Girls ACCYS LLC is a New York limited liability company, with its principal place of business at c/o Bochi Brothers Accessory Network, 225 Montee de Liesse, Saint-Laurant, Quebec, Canada, H4T 1P5.

---

[1] Exhibit C: Second Amended Complaint.

### 2. Kathie Larrea

19. Defendant Kathie Larrea ("Kathie") is a citizen and resident of New York, with an address at 4545 Center Boulevard, Apartment 3419, Long Island City, New York 11109.

### 3. Kristie Larrea

20. Defendant Kristie Larrea ("Kristie") is a citizen and resident of New York, with an address at 1077 Sipp Avenue, Medford, New York 11763. Kathie Larrea and Kristie Larrea are collectively referred to as "Larreas".

### 4. Mehjeez Designs, LLC

21. Defendant Mehjeez Designs, LLC ("Mehjeez") is a New York limited liability company, with an address at 4545 Central Boulevard, Apartment 3419, Long Island City, New York 11109.

### 5. Dispute

22. In or about October 2015, the Larreas approached the Bochis about an investment in a new company that they called "2 Girls", which would be based in New York City. The Bochis were interested in expanding their Canada-based accessories, apparel and related business into the United States at the time. The Bochis, through various entities, claim to have provided the Defendants with funding in excess of $1.6 million for overhead, salaries, lease expenses, and other costs, which was to be repaid in full, plus interest at a rate of 4% per annum in accordance with the Term Sheet of Operating Agreement ("TSOA") signed on or about September 28, 2017.

23. The Plaintiff claims the Defendants mismanaged the "2 Girls Accessories" business and misrepresented their intentions, and performance fell short of Defendants' projections. The Plaintiffs also claim that the Larreas failed to input all of the relevant data into the accounting system established with the accounting firm G&A Services LLC ("G&A"), and blocked the Bochis' access to the email and accounting systems, preventing the Bochis from monitoring operations, as had been agreed to.

24. Ownership of Plaintiff:

    a.  64.5% to 2 Girls Holding Corp. (owned 100% by 9281-5109 Quebec Inc., which is, in turn, owned 100% by the Bochis);

    b.  25.5 % to Mehjeez (owned by the Larreas);

    c.  10% to the Natanel Trust, established for the benefit of Aaron Goshzini and Nir Goshzini.

25.    The Larreas resigned their employment from the Company in June 2018. The Plaintiff alleges that Defendants engaged in numerous wrongful acts, conduct, and omissions that concealed from Plaintiff their improper performance of the Company's day-to-day operations and that prevented Plaintiff from understanding their malfeasance and nonfeasance in "operating" the Company.

## IV.   Analysis of the Matter

### A.  Allegations of Breach of Fiduciary Duty and Duty of Loyalty

26.    According to the TSOA,  Kathie was hired by the Company as Director of Operations. The TSOA also stated that Kathie and Kristie "will work exclusively for the Company and not for their own account or any other party."

27.    The document production and deposition transcripts do not contain any indication that either of the Larreas was experienced in managing the accounting and finance aspects of a business. Kristie earned an associate's degree in design from the Fashion Institute of Technology. Prior to joining the Company, she worked at several other companies in design roles.[2] Kristie testified that inputting accounting information into the computer system was Kathie's responsibility, not hers, though later in her deposition, she said G&A was responsible for implementing the necessary accounting and financial systems.[3]

28.    Kathie started college at Suffolk Community College and transferred to Stony Brook University to major in psychology. She left in her third year and did not finish a degree program.[4] Prior to becoming involved with the Company, Kathie worked for approximately twenty-five years in

---

[2] Exhibit D: Transcript of deposition of Kristie Larrea, October 24, 2024, 8:2-6, 23-9:16.
[3] Exhibit E: Transcript of deposition of Kristie Larrea, October 24, 2024, 47:14-19; 64:19-65:13.
[4] Exhibit F: Transcript of deposition of Kathie Larrea, October 25, 2024, 8:8-20.

various production and operations positions, and did not mention ever having responsibility for accounting and finance at those jobs.[5]

29. In her second deposition, Kathie testified that she "didn't take care of the accounting."[6]

30. Initially, the Bochis' companies handled the accounting, order-taking, and fulfillment. As more orders began coming in, the Larreas suggested engaging G&A to take care of logistics and back-office needs,[7] which was agreed to by the Bochis in reliance on Defendants' representations. Kathie said G&A did not do accounting. She said neither the Company nor the Bochis were able to handle EDI requirements of certain customers, but G&A did have that capability.[8]

31. Paragraph 11 of the TSOA provided that "all members shall have access to and copies of the Company's books and records (whether in hard copy or electronic format) including but not limited to sales reports, cost of goods sold, margins." Emails[9] produced indicate that some financial reporting, including "cash book balance, AR, inventory on hand and in transit and AP" was distributed to the Bochis, and Peter Bochi acknowledged receipt of reporting in his deposition.[10] However, the information provided to them was untimely and incomplete, preventing them from managing Plaintiff's financial condition for the benefit of the Company.

32. Kathie first testified that "Bochis knew every order we were getting" and that "everybody had access to the purchase orders and the purchase orders were then sent to G&A." However, she then clarified that Nancy Barroso would receive purchase orders, and she could not recall whether the Bochis were copied on sales.[11]

33. Paragraph 10 of the TSOA stated that issuance of purchase orders for merchandise would require prior written approval by Abe Bochi, Peter Bochi, or Earl Levett, the CFO of the Bochis' companies.

---

[5] Exhibit G: Transcript of deposition of Kathie Larrea, October 25, 2024, 9:11-13:7.
[6] Exhibit H: Transcript of deposition of Kathie Larrea, October 29, 2024, 48:11-12.
[7] Exhibit I: Transcript of deposition of Peter Bochi, October 17, 2024, 38:24-41:2.
[8] Exhibit J: Transcript of deposition of Kathie Larrea, October 25, 2024, 30:2-8, 33:15-18.
[9] Exhibit K: MEHJEEZ34396, 34422-3.
[10] Exhibit L: Transcript of deposition of Peter Bochi, October 17, 2024, 91:12-14.
[11] Exhibit M: Transcript of deposition of Kathie Larrea, October 25, 2024, 35:9-11, 21-23, 36:10-18.

34.    Based upon my review of documents produced, Kathie caused the administration of the Company's books and records to be split amongst herself, G&A Services, and the Bochis, with no one party having sufficient access to, or knowledge of, all of the information required to efficiently track and analyze the financial status and progress of the business, and enable the smooth operation of the business. There are a number of email exchanges between Kathie and various G&A personnel that indicate instances of poor communication, lack of timely sharing of necessary information, and inadequate supervision by Kathie.

35.    For example, in a September 18, 2017 email exchange between Kathie, Earl Levett, and Caroline Toth, the Accounts Receivable Specialist at G&A, Mr. Levett requested that Ms. Toth follow up with KMART regarding an open invoice. Ms. Toth responded, asking "is someone checking the bank daily for any wire deposits coming in. To stay current I need to have this done daily. If no one wants to do this then I need to have access to the bank to [be] able to retrieve this as I do with all my other clients."[12] There are a number of other emails that have been produced whereby Ms. Toth inquired of Kathie whether a payment had been received by the bank, or Kathie notified Ms. Toth of such. It would have been more efficient for all involved if Ms. Toth had been able to check the bank account herself to determine if payments had been received.

36.    In second example, there is an email exchange that took place between July 1 and August 1, 2017 related to a direct import order for Family Dollar.[13] Kathie emailed Amirsharon Gonzalez of G&A requesting that they receive an order in the system so they can invoice the goods. Gonzalez responds that the appropriate documentation has not been received and he cannot receive the order until they correct documents are produced. On August 1, 2017, Gonzalez confirms that the correct documents have now been provided, and writes "But can you please send the docs ahead of time?!"

37.    The string continues through August 16, 2017, with Kathie following up with additional G&A personnel about the status of the shipment and invoicing.

---

[12] Exhibit N: MEHJEEZ34653-5.
[13] Exhibit O: MEHJEEZ34662-7.

38.  A January 31, 2018 email exchange[14] between Kathie and Adrienne Plaugher in the Billing Department of G&A revealed a situation in which there was a shortage in the number of items shipped to a customer due to a misunderstanding about the number of units and/or cartons on the order. Kathie writes that "This was actually a big mistake that may have caused [sic] me a customer."

39.  Mr. Levett regularly followed up with Kathie and the G&A staff to encourage them to follow up on collection of outstanding accounts receivable.[15]

40.  The Bochis' attempt to exercise their rights as majority owners (by way of their ownership of 2 Girls Holdings Corp.) of the Company, and Abe's role as a Manager, by providing information technology support by taking responsibility for the Company's domain and email was rebuffed by Kathie.[16] The Larreas withheld from the Bochis the passwords necessary for access to the Company's computers and Microsoft email accounts, despite the Bochis' requests for access to such information.[17] The Bochis, as majority owners of the Company, and Abe as a Manager, were entitled to access to such information.

41.  Defendants did not provide access to the Company's Dropbox account to the Bochis until in or about early 2018, despite the Bochis requesting access before that time.[18]

42.  It is evident from multiple email exchanges[19] that Defendants did not provide to G&A all Company business information, including but not limited to purchase orders, which resulted in the various reports that G&A provided to the Bochis lacking a complete presentation of the Company's financial position. Based on these emails, it is my understanding that the Bochis requested on many occasions that Defendants input all financial information into the G&A system so that the Bochis would have a complete understanding of the Company's financial status and its business and could keep apprised of the Company's operations, but Defendants did

---

[14] Exhibit P: MEHJEEZ34192-4.
[15] Exhibit Q: MEHJEEZ34381-3, 34394-5, 34455.
[16] Exhibit R: P9167-71.
[17] Exhibit S: Transcript of Deposition of Abe Bochi, December 10, 2024, 235:24-237:9, 281:15-293:21.
[18] Exhibit T: Transcript of Deposition of Abe Bochi, October 16, 2024, 97:17-98:6, 111:2-12, 112:13-114:16.
[19] Exhibit U: P4848-53, P9153-9160.

not do so. Defendants controlled how much and what Company business information was provided to G&A in the first place. It appears that the first time that the Bochis were able to obtain a sales order confirmation report from G&A was in July 2018, after the Larreas had resigned from the Company.[20]

43.   Leveraging the experienced resources available through the Bochis and their businesses could have provided efficiencies and money saving strategies for the Company, but Defendants declined to take advantage of these resources and Kathie mocked Mr. Levett's efforts to obtain information to better prepare cash flow estimates for the business.[21]

44.   The Larreas had no prior experience operating a business, nor any training in accounting and finance. The Bochis had many years of experience operating multiple businesses, and were willing to provide resources, including funding, a Chief Financial Officer, and their own knowledge and experience, to support their business relationship with Defendants in the Company. Defendants chose to accept the funding, but did not provide the Bochis the level of access to the Company's financial, business, and accounting information that was agreed to in the TSOA and that would be reasonably expected. Defendants' actions and omissions were not in the best interests of the Company, and were inconsistent with their fiduciary duty and duty of loyalty to the Company.

45.   Defendants' actions and omissions are also consistent with corporate misconduct. They were tasked with the day-to-day operations of the Company, yet willfully acted in ways that damaged the Plaintiff by failing to ensure transparency and implementation of best practices for the benefit of the Company.

---

[20] Exhibit V: Reply affidavit of Abe Bochi, December 19, 2018.
[21] Exhibit W: MEHJEEZ34594-34601.

## V.    Conclusions

47.    Based upon applicable accounting standards, my education and experience, the information made available to me, my examination of publicly available data, and the analysis described herein, it is my professional opinion as a forensic accountant that the actions and omissions of the Defendants, in particular their failure to provide the Bochis with sufficient financial, business, and accounting data to allow them to appropriately monitor and manage the Company's financial condition, were not consistent with their fiduciary duty and duty of loyalty to Plaintiff. Defendants' actions were not in the best interest of the Company.

48.    My opinions are expressed with a reasonable degree of accounting certainty. I reserve all cumulative rights and remedies without exception, including the right to modify and supplement this report should new or additional information become available, or should the Client request additional analysis.


Respectfully submitted this 6th day of January 2025.


_____
Rebecca Fitzhugh
Signing Director
CliftonLarsonAllen LLP